**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DANIEL MINTEN,

    Plaintiff,

vs.

DOUGLAS L. WEBER, individually and
in his official capacity as Sheriff of
Osceola County, Iowa,

    Defendant.

No. C11-4004-MWB

**MEMORANDUM OPINION AND
ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

I.  *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . 2
 *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
 *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
 *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
 *B. First Amendment Retaliatory Discharge* . . . . . . . . . . . . . . . . . . . . . 11
  *1.*  **Prima facie** *case of retaliation* . . . . . . . . . . . . . . . . . . . . . 14
  *2.*  *Minten's* **prima facie** *case* . . . . . . . . . . . . . . . . . . . . . . 15
   *a. Protected speech* . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *i.*  *Was Minten speaking as a citizen?* . . . . . . . . 15
    *ii.*  *Matter of public concern* . . . . . . . . . . . . . . 17
    *iii.*  *Balancing interests* . . . . . . . . . . . . . . . . . . 19
   *b. Adverse employment action* . . . . . . . . . . . . . . . . . . 26
   *c. Causation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
  *3.*  *Alternative reasons for Minten's firing* . . . . . . . . . . . . . . . 29

III.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Last year, following a bench trial, I found that defendant Douglas L. Weber, the Sheriff of Osceola County, Iowa, violated a right wing gadfly's First Amendment free speech rights by denying his application for a concealed weapon permit due to the applicant's protected free speech activities ("the Dorr Lawsuit"). *See Dorr v. Weber*, 741 F. Supp.2d 1010, 1020 (N.D. Iowa 2010).[1]   Prior to the Dorr Lawsuit going to trial, plaintiff Daniel Minten, a longtime Osceola County Deputy Sheriff, offered to testify in support of the plaintiff in the Dorr Lawsuit.  After Weber learned of Minten's offer to testify, Weber fired him.  The parties' cross-motions for summary judgment require me to decide whether Minten's firing violated his First Amendment rights.

## I.  INTRODUCTION AND BACKGROUND

### A.  Procedural Background

On January 10, 2011, plaintiff Daniel Minten filed a Complaint naming defendant Douglas L. Weber, individually and in his capacity as Sheriff of Osceola County and asserting claims under 42 U.S.C. §§ 1983 and 1988 (civil rights statutes), 28 U.S.C. § 2201 (declaratory judgment statute), and the First Amendment to the United States Constitution.  In his Complaint, Minten alleges that his employment as a Osceola County Deputy Sheriff was terminated in 2009 when he offered to testify in the Dorr Lawsuit concerning whether Weber had violated the First Amendment in denying two individuals nonprofessional permits to carry weapons, pursuant to Iowa Code § 724.7,  even though they met all of the statutory criteria necessary for issuance of such permits, pursuant to

---

[1] As part of the relief granted in the Dorr Lawsuit, I required Weber to take and successfully complete a college level course on the United States Constitution. *Dorr*, 741 F. Supp.2d at 1021-22.  If Weber had taken that course before the events giving rise to this lawsuit, it may well have been prevented.

IOWA CODE § 724.8, in retaliation for exercising their First Amendment rights. Minten alleges Weber terminated his employment in retaliation for and in violation of Minten's First Amendment right to free speech.

On September 30, 2011, both Minten and Weber filed a Motion for Summary Judgment (docket nos. 18 and 19). Weber argues Minten was not protected from discipline by the First Amendment because he was acting in his official capacity as a deputy sheriff when he made the statement at issue. Weber also argues that if Minten was speaking as a citizen at the time he made the statement, he had no constitutionally protected right to engage in purely private conduct while working as a deputy sheriff for Osceola County. In contrast, Minten contends that summary judgment should be granted in his favor. He argues that his statements related to a matter of public concern and Weber fired him in retaliation for making the statements, violating the First Amendment.

Minten filed a timely response to Weber's Motion For Summary Judgment in which he argues that his statements were made outside his official duties and did not interfere with the performance of his job. Weber, likewise, filed a timely response to Minten's Motion for Summary Judgment. In his response, Weber argues Minten cannot establish a *prima facie* case of retaliation based on the First Amendment because he was not engaged in protected speech since Minten was speaking in his official capacity as a deputy sheriff, and not as a private citizen, when he offered to testify. Weber also argues Minten was not engaged in protected speech because his offer to testify was not a matter of public concern. Weber further contends that summary judgment on Minten's motion is inappropriate because he has generated a genuine issue of material fact on the question of whether Minten's protected conduct was a motivating factor in Weber's decision to fire him. Minten, in turn, filed a timely reply brief in which he argues that he was engaged in

3

protected speech since he was speaking as a private citizen about a matter of public concern. Minten also contends that summary judgment on his behalf is appropriate because Weber's consistent statements demonstrate that Minten's First Amendment activities were a motivating factor for his firing.

## B. Factual Background

I set forth those facts, both undisputed and disputed, sufficient to put in context the parties' arguments concerning the cross-motions for summary judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in my legal analysis.

Plaintiff Daniel Minten served as an Osceola County, Iowa, Deputy Sheriff for 21 years. On February 1, 2010, he was fired by defendant Osceola County Sheriff Douglas L. Weber. The event underlying Minten's firing arose six months earlier, in August of 2009. On August 31, 2009, Minten performed a traffic stop on a vehicle being driven by Emily Dorr ("Emily"). Minten stopped Emily for a traffic violation, speeding. Minten was working his regular shift and performing his regular responsibilities as a patrol officer. He was driving a county vehicle. Emily is the daughter of Paul Dorr ("Paul") and sister of Alexander Dorr (Alexander"), the plaintiffs in the Dorr Lawsuit. At the time of Emily's traffic stop, the Dorr Lawsuit was pending in the Northern District of Iowa. After Minten gave Emily a verbal warning for speeding, he talked to her about the Dorr Lawsuit and offered to testify on Paul's behalf, but noted that he would have to be subpoenaed. Minten and Emily's entire conversation about the Dorr Lawsuit lasted approximately two minutes. Minten's offer to testify was unrelated to the traffic stop and was not part of his

official duties.  He testified in his deposition that his offer to testify had "nothing to do with being a cop."  Minten Dep. at 101; Defendant's App. at 10.

At some point, Weber viewed a video recording of Emily's traffic stop when searching for a video recording of a later Minten traffic stop which had resulted in a citizen complaint.[2]  He then showed the recording to the county attorney, several deputy sheriffs, and at least one county supervisor.  On December 21, 2009, Weber wrote a letter to Minten.  Weber wrote:

> Enclosed is a copy of a letter dated 09-15-09 concerning a complaint filed against you by Jacob Bos.  I would like to schedule an interview with you concerning this matter and the following issues:
> 1.  The Dan Raduz Incident from 07-06-09.
> 2.  The Super 8 Incident on 06-10-09.
> 3.  The use of force against Loren Hennings on 09-09-09 and the Osceola County Sheriff's Office Taser Policy.
> 4.  A videotape allegedly showing you conducting a traffic stop and conspiring to undermine the Office of Sheriff and Osceola County Iowa concerning a Federal Lawsuit filed by a Mr. Paul Dorr.  There is a lack of documentation of this traffic stop.
>
> Preston DeBoer may pick up these files and a copy of the videos or they can be mailed to him.  You may have legal counsel/legal representation present during the interview at your own expense.
> If you have any questions please feel free to contact me.

---

[2]The record does not indicate precisely when Weber viewed the video.

Weber letter at 1; Plaintiff's App. at 52.[3]

On February 1, 2010, Weber fired Minten during a meeting for his actions during Emily's traffic stop, labeling Minten's actions as "insubordination."[4] Also on February 1, 2010, Weber memorialized Minten's firing in a file memorandum, writing: "Effective February 1, 2010 Deputy Dan Minten is terminated for insubordination. Deputy Minten is not eligible for re-hire." Weber memorandum at 1, Defendant's App. at 39. Weber told deputy sheriffs that it was inappropriate for Minten to offer to testify while on duty.

After his firing, Minten made a claim for unemployment compensation. On February 8, 2010, as part of Minten's unemployment compensation process, Weber completed an "Employer Statement of Protest" form in which he indicated that he fired Minten for "misconduct" on "08-31-09." Employer Statement of Protest Form at 2; Plaintiff's App. at 41. Weber went on to remark on the form, "Insubordination on or about 08-31-09". Employer Statement of Protest Form at 2; Plaintiff's App. at 41. On the same form, Weber offered the following explanation for Minten's firing:

> He is on video tape in the patrol car and he has a traffic stop talking to the daughter of a person who is suing us in federal court. He said he wanted to be part of the law suit [sic] but he wanted to be subpeneo [sic] so it looks like he has to. He said I shouldn't be saying this but he never looks at the video any way. This undermines me my office and the county. The lawsuit is about I denied an individual to carry a concealed weapon. My opinion is he is trying to cause me some injury or pain my enemy is his friend in this case. I did say I am not going to contest his unemployment. I gave him the

[3] Preston DeBoer was Minten's union representative.

[4] This meeting was recorded.

6

> opportunity to resign and he said no it would mess up my
> unemployment so I fired him like he asked.

Fact Finding Worksheet For Misconduct at 1; Plaintiff's App. at 47.

On February 18, 2010, a telephonic hearing on Minten's unemployment compensation claim was conducted by the Iowa Workforce Development Department. During this hearing, Weber repeated that he had fired Minten for "insubordination" resulting from his offer to testify in the Dorr Lawsuit. Audio CD; Plaintiff's App. at 122. Weber characterized Minten's offer to testify as entering into a conspiracy to undermine the Osceola Sheriff's Office and Osceola County. Audio CD; Plaintiff's App. at 122.

On March 9, 2010, at an Osceola County Board of Supervisors meeting, in discussing Minten's termination, Weber stated, "[t]he issue is what his behavior was on the Dorr Stop. It's on videotape. It speaks for itself." Audio CD; Plaintiff's App. at 123. Weber also made the following comment regarding Minten's First Amendment right to free speech: "he's talking about, free speech is one thing that's fine, but he wanted to take an active role to undermine the office of sheriff and undermine his employer and that speaks for itself." Audio CD; Plaintiff's App. at 123. Minten's offer to testify did not cause people to lose confidence in Weber and did not cause any division in the Osceola County Sheriff's Office.

On April 14, 2010, in an administrative appeal from the unemployment compensation hearing, the Iowa Workforce Development Department reinstated Minten's unemployment compensation, finding that Minten's action during Emily's traffic stop

> Fails to constitute misconduct because [Minten] did not take
> any action not in the best interest of the Sheriff's office.
> Agreeing to testify and tell the truth is the duty of every law
> enforcement officer. No misconduct has been established.

7

Administrative Law Judge Decision at 2-3; Plaintiff's App. at 50-51.[5]

## II.  LEGAL ANALYSIS

### A.  Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.  An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party'

---

[5]Weber did not take part in the appeal hearing.

on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

> functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*).

The Eighth Circuit Court of Appeals recognized in a number of panel decisions that summary judgment is "disfavored" or should be used "sparingly" in employment discrimination cases. *See id.*, at 1043 (collecting such cases in an Appendix). The rationales for this "employment discrimination exception" were that "discrimination cases often turn on inferences rather than on direct evidence. . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and that "intent" is generally a central issue in employment discrimination cases. *See, e.g., Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). On the other hand, the Supreme Court recognized that, even in employment discrimination cases, "'the ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In its *en banc* decision in *Torgerson*, the Eighth Circuit Court of Appeals expressly rejected the notion that summary judgment in employment discrimination cases is considered under a separate standard, citing *Reeves* and *Celotex*. Instead, the court held as follows:

> Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

*Torgerson*, 643 F.3d at 1043.

Therefore, I will apply these standards to the parties' respective motions for summary judgment.

## B. First Amendment Retaliatory Discharge

Law enforcement officers do not shed their constitutional rights to freedom of speech upon donning their uniform. Freedom of speech without governmental censorship or restriction is enshrined in the First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry,* 485 U.S. 312, 318 (1988) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)). It

has oft been described as an expression of "the most cherished" of our democratic ideals. *United States v. Robel,* 389 U.S. 258, 264 (1967). "Speech remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain.'" *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2670 (2011) (quoting *Snyder v. Phelps,* 131 S. Ct. 1207, 1220 (2011)). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore,* 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton,* 523 U.S. 574, 588 n.10 (1998)). It comes as no surprise then that "'[a] public employer may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" *Rynders v. Williams*, 650 F.3d 1188, 1194 (8th Cir. 2011) (quoting *McGee v. Public Water Supply, Dist. No. 2 of Jefferson Cnty., Mo.,* 471 F.3d 918, 919 (8th Cir. 2006) (internal quotation marks omitted)). The United States Supreme Court observed earlier this year:

> When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). If an employee does not speak as a citizen, or does not address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Ibid.*

*Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, (2011). However, "[a] public employee's personal complaints to his employers, even if they are about a matter of public interest, do not constitute protected speech." *Lesher v. Reed*, 12 F.3d 148, 151 (8th Cir. 1994). As the Eighth Circuit Court of Appeals has explained:

12

> A public employee retains a degree of First Amendment protection when she speaks as a citizen addressing matters of public concern. *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). But if speech is outside this category, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* at 418, 126 S. Ct. 1951. In particular, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S. Ct. 1951; *see Lindsey v. City of Orrick,* 491 F.3d 892, 898 (8th Cir. 2007).

*Bonn v. City of Omaha*, 623 F.3d 587, 592 (8th Cir. 2010).

"Speech involves a matter of public concern when it relates to a matter of political, social, or other community concern." *Dahl v. Rice Cnty., Minn.*, 621 F.3d 740, 744 (8th Cir. 2010) (citing *Connick*, 461 U.S. at 146.) "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983); *see Buazard v. Meridith,* 172 F.3d 546, 548 (8th Cir. 1999) ("'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context' of the speech, and that speech must relate to some 'matter of political, social or other concern to the community.'") (quoting *Connick,* 461 U.S. at 146-47). As the Eighth Circuit Court of Appeals has explained:

> "The focus is on the role the employee has assumed in advancing the particular expressions: that of a concerned public citizen, informing the public that the state institution is not properly discharging its duties, or engaged in some way in misfeasance, malfeasance or nonfeasance; or merely as an employee, concerned only with internal policies or practices

13

> which are of relevance only to the employees of that
> institution."

*Dahl*, 621 F.3d at 744 (quoting *Cox v. Dardanelle Pub. Sch. Dist.*, 790 F.2d 668, 672 (8th Cir. 1986)).  This is a question of law for me to determine.  *Connick,* 461 U.S. at 148, 148 n. 7; *see McGee,* 471 F.3d at 920.  If the employee fails to prove he was speaking as a citizen on a matter of public concern, he has no First Amendment cause of action. *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006).  If, on the other hand, the employee proves that he spoke as a citizen on a matter of public concern, the employee's speech enjoys First Amendment protection only if his speech survives the balancing test set out in *Pickering v. Board of Ed. of Township High School District 205, Will County, Illinois,* 391 U.S. 563 (1968).  *McGee,* 471 F.3d at 920.  *Pickering* requires me to determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti,* 547 U.S. at 418 (citing *Pickering,* 391 U.S. at 568).

### 1.    Prima facie *case of retaliation*

To establish a *prima facie* case of retaliation based on the First Amendment, Minten must prove:  (1) he engaged in protected speech, i.e. speaking as a citizen on a matter of public concern, (2) Weber took an adverse employment action against him, and (3) his speech was a motivating factor in the adverse action taken against him.  *See Rynders*, 650 F.3d at 1194; *Davenport v. University of Ark. Bd. of Trustees*, 553 F.3d 1110, 1113 (8th Cir. 2009); *Davison v. City of Minneapolis*, 490 F.3d 648, 654-55 (8th Cir. 2007); *Littrell,* 459 F.3d at 922; *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 801 (8th Cir. 2004); *see also Okruhlik v. University of Ark.,* 395 F.3d 872, 878 (8th Cir. 2005) (noting the same analysis applies to First Amendment and Title VII retaliation claims).  "Whether speech was a motivating factor 'is a question of fact, but the sufficiency of the evidence

to create an issue of fact is a question of law.'" *Littrell*, 459 F.3d at 922 (quoting *de Llano v. Berglund,* 282 F.3d 1031, 1036 (8th Cir. 2002)). If Minten meets this burden, then the burden of proof shifts to Weber to show that he would have taken the same action regardless of Minten's free speech activities. *See McCullough v. University of Ark. for Med. Sciences*, 559 F.3d 855, 865 (8th Cir. 2009); *Altonen v. City of Minneapolis,* 487 F.3d 554, 559 (8th Cir. 2007); *Cox,* 790 F.2d at 672-676.

### 2.  *Minten's* prima facie *case*

#### a. *Protected speech*

Weber argues Minten cannot establish a *prima facie* case of retaliation based on the First Amendment because he was not engaged in protected speech when he offered to testify in the Dorr Lawsuit. Weber contends that Minten's discussion with Emily was in his official capacity as a deputy sheriff, and not as a private citizen. Weber notes that when Minten stopped Emily, he was wearing his uniform, driving his patrol car, working his regular shift as a deputy sheriff, and performing his regular responsibilities as a patrol officer. Minten counters that his statements to Emily about the Dorr Lawsuit were completely unrelated to the purpose of the traffic stop-a traffic violation for speeding. Minten points out that he had already concluded the purpose of his traffic stop, Emily's traffic violation, when he struck up a conversation with her about the Dorr Lawsuit.

*i.  Was Minten speaking as a citizen?* The United States Supreme Court has identified several non-dispositive factors in analyzing the speaker's role, including the internal versus external nature of the speech and whether the subject matter concerned the speaker's employment. *Garcetti,* 547 U.S. at 420–21. The Court observed that formal job descriptions, although relevant, are not controlling, because they "often bear little resemblance to the duties an employee actually is expected to perform, and the listing of

a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424–25. Instead, the inquiry is a "practical one," and the controlling factor is whether the statement was made "pursuant to" one of the speaker's employment duties. *See id.* at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

Although, as Weber points out, Minten made his offer to testify while on duty, the United States Supreme Court has recognized that not all speech which occurs at work is made pursuant to an employee's official duties:

> Employees in some cases may receive First Amendment protection for expressions made at work. *See*, *e.g.*, *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979). Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like "any member of the general public," *Pickering,* 391 U.S., at 573, 88 S. Ct. 1731, to hold that all speech within the office is automatically exposed to restriction.

*Garcetti,* 547 U.S. at 420–21; *see Thomas v. City of Blanchard,* 548 F.3d 1317, 1323-24 (10th Cir. 2008) ("The question under *Garcetti* is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment. . . . Rather, it is whether the speech was made pursuant to the employee's job duties, or in other words, whether it was 'commissioned' by the employer") (quoting *Garcetti,* 547 U.S. at 421-22). Indeed, as the Seventh Circuit Court of Appeals observed:

> Of course no one in this country works every minute of the
> workday and no employer tries to prevent his employees from
> engaging in private conversations during the workday-
> conversations that may touch on political or religious matters-
> as long as the conversations do not interfere with the
> employees' work.

*May v. Evansville-Vanderburgh Sch. Corp*, 787 F.2d 1105, 1110 (7th Cir. 1986).

Minten's offer to testify in the Dorr Lawsuit was made in just such a private conversation.

Minten's conversation with Emily about the Dorr Lawsuit was unrelated to the reason for

the traffic stop, Emily's speeding, and occurred after he had completed giving Emily an

oral warning about speeding.   Their conversation was brief, lasting only about two-

minutes.   Minten's official duties did not include sharing his views with Emily on Weber's

rejection of her father's and brother's applications for nonprofessional permits to carry

weapons.   Moreover, it was not within Minten's job duties to volunteer to testify about

Weber's actions.  Based on the record as a whole, I find that Minten made his offer to

testify to Emily in his capacity as a private citizen rather than a deputy sheriff.

       ***ii.***     ***Matter of public concern***.  Having found that Minten was speaking in his

capacity as a private citizen, I must further determine whether he was speaking on a matter

of public concern.   Speech involving a matter of public concern enjoys robust First

Amendment protection.   However, if I determine that Minten's speech does not involve

a matter of public concern, the First Amendment analysis ends and Weber is entitled to

summary judgment. *See Garcetti,* 547 U.S. at 418; *Connick,* 461 U.S. at 146.   To

constitute speech on a matter of public concern, Minten's speech must "be fairly

considered as relating to any matter of political, social, or other concern to the

community." *Connick,* 461 U.S. at 146. "[A] topic is a matter of public concern for First

Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of

value and concern to the public at the time' of the speech." *Jackler v. Bryne*, 658 F.3d 225, 236 (2nd Cir. 2011) (quoting *City of San Diego v. Roe,* 543 U.S. 77, 83–84 (2004)). Whether a public employee's speech involves a matter of public concern depends upon "the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147-48.

Minten was volunteering to testify for the plaintiffs in the Dorr Lawsuit, a lawsuit in which Emily's father and brother alleged that Weber had violated their constitutional rights by illegally denying their applications for nonprofessional permits to carry weapons. Federal courts have recognized that "'[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public.'" *Jackler* , 658 F.3d at 236 (quoting *Branton v. City of Dallas,* 272 F.3d 730, 740 (5th Cir. 2001); *see Garcetti,* 547 U.S. at 425 ("governmental . . . misconduct is a matter of considerable significance"); *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) ("As a matter of law, 'the competency of the police force is surely a matter of great public concern.'") (quoting *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir. 1983)); *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) ("While speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, speech 'complaining of misconduct within the police department . . . [is] speech addressing a matter of public concern.'") (quoting *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir. 2001) (internal quotation marks omitted)); *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 53 (1st Cir. 2003) (holding police officer's statements alleging corruption, perjury, and mishandling of investigation were a matter of public concern); *Martinez v. Hooper*, 148 F.3d 856, 859 (7th Cir. 1998) ("[I]t goes without saying that police misconduct is a matter of public concern."); *Breuer v. Hart,* 909 F.2d 1035, 1038 (7th Cir. 1990) (holding sheriff's alleged

18

conversion of county property was "plainly of public concern in its substance"); *Brawner v. City of Richardson,* 855 F.2d 187, 191-92 (5th Cir. 1988) (holding police department's alleged misconduct in covering up internal investigations was "a matter of public interest and therefore deserves constitutional protection"); *see also Deutsch v. Jordan,* 618 F.3d 1093, 1100 (10th Cir. 2010)(noting that "'speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials clearly concerns matters of public import.'") (quoting *Dill v. City of Edmond,* 155 F.3d 1193, 1202 (10th Cir. 1998) (ellipsis and internal quotation marks omitted)); *cf. Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir. 1993) ("Obviously, speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern."); *Patrick v. Miller,* 953 F.2d 1240, 1247-48 (10th Cir. 1992) ("'[s]peech which discloses any evidence of corruption, impropriety or other malfeasance on the part of city officials, in terms of content, clearly concerns matter of public import'") (quoting *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir. 1988)). Thus, because Minten's speech concerned his willingness to testify about what he viewed as Weber's misconduct in the issuance of concealed weapons permits, it was a matter of public concern. *See Jackler*, 658 F.3d at 236; *Robinson*, 566 F.3d at 822; *Guilloty Perez v. Pierluisi,* 339 F.3d at 53.

 *iii. Balancing interests*. Having found that Minten was speaking as a citizen on a matter of public concern, the First Amendment offers protection if his speech survives the balancing test of *Pickering v. Board of Ed. of Township High School District 205, Will County, Illinois,* 391 U.S. 563 (1968). *See McGee,* 471 F.3d at 920. In *Pickering*, the United States Supreme Court instructed that there must be a balance between the "interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it

performs through its employees." *Pickering*, 391 U.S. at 568. The Court recognized that situations may exist in which the need for confidentiality between the employer and employee is so great, or the relationship is so personal and intimate in nature, that an employee's criticism of the employer might constitute grounds for dismissal without violating the First Amendment. *Id*. at 570 n.3. In *Pickering*, the Court held that a public school teacher could not be fired for publishing a letter in a newspaper criticizing the school board's budgetary policies. *Id*. at 563. The Court noted that because the teacher was speaking on matters of "public concern," and her conduct did not interfere with the teacher's performance or the school's operation, she could not suffer adverse employment consequences based of her letter. *Id*. Thus, *Pickering* requires me to determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti,* 547 U.S. at 418 (citing *Pickering,* 391 U.S. at 568). Weber does not address this analysis.

The United States Supreme Court recognized in *Garcetti* that:

> "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society."

*Garcetti*, 547 U.S. at 418-19 (citation omitted). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* 461 U.S. at 151-52. Law enforcement agencies have a strong interest in maintaining discipline and order within their ranks. *See Bartlett v. Fisher*, 972 F.2d 911, 918 (8th Cir. 1992) (noting that law enforcement agency "has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale,

and instill public confidence in the law enforcement institution.'") (quoting *Hughes v.* *Whitmer*, 714 F.2d 1407, 1419 (8th Cir. 1983)); *see also Starling v. Board of Cnty.* *Comm'r*, 602 F.3d 1257, 1262 (11th Cir. 2010); *Stanley v. City of Dalton*, 219 F.3d 1280, 1289 (11th Cir. 2000); *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000); *Kokkinis v. Ivkovich*, 185 F.3d 840, 846 (7th Cir. 1999); *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998); *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992); *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991); *Jurgensen v.* *Fairfax Cnty., Va.*, 745 F.2d 868, 880 (4th Cir. 1984).   As a result, "comments concerning co-workers performance of their duties and superior officers' integrity can directly interfere with the confidentiality, esprit de corps and efficient operation of the police department."   *Busby*, 931 F.2d at 774 (citations and quotations omitted); *see* *Oladeinde*, 230 F.3d at 1293 ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony. . .").

Against a law enforcement department's interest in departmental efficiency and harmony must be weighed the need to protect and encourage public employee witnesses. The law has long afforded certain protections to witnesses in order to encourage their full and truthful testimony.   Under the common law, witnesses had immunity from lawsuits for damages for testimony in judicial proceedings.   *See Briscoe v. LaHue*, 460 U.S. 325, 331 (1983).   The grant of immunity sought to prevent two kinds of self-censorship.   First, absent immunity, witnesses might be reluctant to come forward.   *See id.* at 333 (citing *Henderson v. Broomhead*, 157 Eng. Rep. 964, 968 (Ex. 1859)).   Second, witnesses might distort their testimony out of fear of subsequent liability.   The United States Supreme Court explained how this grant of immunity promoted the full disclosure of relevant facts:

> Even within the constraints of the witness's oath there may be
> various ways to give an account or to state an opinion. These

> alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. But the truth finding process is better served if the witness' testimony is submitted to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.

*Briscoe,* 460 U.S. at 333-34 (internal citations and quotations omitted). Considering the common law tradition and Congressional intent, the Supreme Court has extended witness immunity to § 1983 actions. *See id.* at 345-46 (noting the "indispensable" role that witnesses play in the adjudicatory process).

In the last thirty years, federal courts have afforded additional protection to witnesses who are employed by the government under the "modern 'unconstitutional conditions doctrine,' [which] holds that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 674 (1996) (internal citations and quotations omitted); *see also Andersen v. McCotter,* 100 F.3d 723, 727 (10th Cir. 1996) (explaining the unconstitutional conditions doctrine and noting that "the Court has recognized a variety of benefits which cannot be denied solely because of the exercise of constitutional rights," including the offer of a government job).

Absent such protection, employers seeking to silence truthful testimony could present employees with a difficult choice. "Employees could either testify truthfully and lose their jobs or could lie to the tribunal and protect their job security." *Johnston v. Harris Cnty. Flood Control Dist.,* 869 F.2d 1565, 1578 (5th Cir. 1989). Either choice

would come at an unacceptably high price: "Those able to risk job security would suffer state-sponsored retaliation for speaking the truth before a body entrusted with the task of discovering the truth." *Id.* On the other hand, "[t]hose unwilling or unable to risk unemployment would scuttle our efforts to arrive at the truth." *Id.* Thus, affording constitutional protection to the truthful testimony of public employees protects both employees' interest in free expression and the public's interest in a judicial system capable of arriving at the truth. *Id.; see also Smith,* 693 F.2d at 368 (concluding that the "[F]irst [A]mendment protects the right to testify truthfully at trial" and that such protection is also supported by "the right of a defendant at trial to compulsory process and the goal of our criminal justice system to arrive at the truth").

Nevertheless, First Amendment protection of public employees' testimony is not absolute. In *Tedder v. Norman,* 167 F.3d 1213, 1215 (8th Cir. 1999), the Eighth Circuit Court of Appeals rejected a First Amendment challenge to the demotion of a deputy director of a state law enforcement training academy who had testified as an expert witness that a deputy sheriff of one of the agencies that sent trainees to the academy had used excessive force. The court of appeals resolved the *Pickering* balancing test in favor of the employer, reasoning that the "actual disruption and potential further disruption" caused by the plaintiff's testimony justified the academy's decision to demote him. *Id.* It is Weber's burden to demonstrate actual or possible work place disruptions resulting from Minten's speech. S*ee Guilloty Perez,* 339 F.3d at 54. Here, in contrast to *Tedder,* Weber has failed to offer any evidence of any actual or possible work place disruptions resulting from Minten's speech.[6] Moreover, Minten was volunteering to testify as a fact witness

---

[6]Minten's offer to testify was not disclosed by him to other members of the sheriff's

(continued...)

in an effort to combat police misconduct at the highest level, the sheriff himself, in contrast to the employee in *Tedder* who testified as an expert witness.

Mr. Justice Black cogently observed over a half-century ago that "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Bridges v. California*, 314 U.S. 252, 260 (1941). Only by protecting witnesses' free speech rights are fair trials possible. The importance of safeguarding a witness from harassment is particularly acute when the witness is a law enforcement officer whose testimony is combating the pernicious problem of police misconduct. This is because such a witness must break the "blue wall" or "code of silence" to testify about wrongdoing within a law enforcement department or agency.[7] *See Brandon v. Holt*, 469 U.S. 464, 467 n.6 (1985) (recognizing that "'[d]ue to a code of silence induced by peer pressure among the rank-and-file officers and among some police supervisors, few-if any-formal complaints were ever filed by police personnel.'") (quoting district court's decision, *Brandon v. Allen*, 516 F. Supp. 1355, 1361 (D. Tenn. 1981)); *Thomas v. New Orleans*, 687 F.2d 80, (5th Cir. 1982) (recognizing testimony of former New Orleans Chief of Police acknowledging that a "blue curtain" of silence exists on most

---

[6](...continued)
department, but by Weber himself.

[7]The "code of silence" "is the informal rule according to which one police officer does not report on or testify against another police officer, regardless of the nature of the accused officer's conduct." *Kinney v. Weaver*, 367 F.3d 337, 365 n.32 (5th Cir. 2004) (citing *Snyder v. Trepagnier,* 142 F.3d 791, 797 n.6 (5th Cir. 1998) (citing an expert witness)); *Cunningham v. Gates*, 229 F.3d 1271, 1283 n.19 (9th Cir. 2000)( noting that code of silence "'consists of one simple rule, an officer does not provide adverse information against a fellow officer.'") (quoting *Report of the Independent Commission on the Los Angeles Police Department* 168 (1991)).

24

every major police force).   If this matter of great importance to the public, and the courts, is to be facilitated, it is essential that law enforcement officers, such as Minten, be able to testify freely about misconduct without the pressure of a "code of silence" and fear of extreme retaliatory measures being brought to bear against them.   *See Cunningham v. Gates*, 229 F.3d 1271, 1283 n.19 (9th Cir. 2000) (noting that the Christopher Commission Report released, following the publicized beating of Rodney King, describes the "code of silence" as "'[p]erhaps the greatest single barrier to the effective investigation and adjudication of complaints'" of police misconduct.) (quoting *Report of the Independent Commission on the Los Angeles Police Department* 168 (1991)).   Accordingly, I have little trouble finding that the public's interest in obtaining witness testimony about police misconduct outweighs the sheriff department's interest in order and efficiency.   *See Guilloty Perez,* 339 F.3d at 53 (holding that public's interest in law enforcement officer's statements describing his suspicion about the mishandling of an investigation and possible police corruption and perjury outweighed law enforcement agency's interest in maintaining workplace harmony); *Wilson v. UT Health Center,* 973 F.2d 1263, 1270 (5th Cir. 1992) (holding that police officer's interest in reporting sexual harassment within police department outweighed the police force's interest in "departmental efficiency and harmony."); see also *Rivera-Jimenez v. Pierluisi,* 362 F.3d 87, 94 (1st Cir. 2004) (holding that law enforcement agent's speech which raised the possibility of corruption in a public agency was protected under the First Amendment); *Victor v. McElveen,* 150 F.3d 451, 457 (5th Cir. 1998) (recognizing, in relation to a deputy sheriff's First Amendment claim, that "concerns about maintaining harmony and eliminating disruption cannot be the sole measure of government interest when the employee's speech furthers other important state

interests"). Thus, I find that Minten was engaging in constitutionally protected speech when he offered to testify in the Dorr Lawsuit.

### b. Adverse employment action

It is uncontested that Minten's firing constitutes an adverse employment action. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (holding that "adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.") (internal citations, quotation marks and brackets omitted). Thus, I find that Minten has established the second prong of his *prima facie* case, leaving only the issue of causation to be determined.

### c. Causation

Having concluded that Minten possessed a protected interest in his offer to testify, I now turn to the step of the First Amendment retaliation analysis in which I must determine whether there is a genuine issue of material fact as to whether Minten's protected speech was a motivating factor in Weber's decision to fire him. On the issue of causation, I must consider whether Weber's decision to fire Minten "was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in those decisions." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citing *Wishnatsky v. Rovner*, 433 F.3d 608, 613 (8th Cir. 2006)). "Retaliatory motive . . . may be proved by circumstantial evidence giving rise to an inference of retaliatory intent." *Williams v. City of Carl Junction, Mo.*, 523 F.3d 841, 843 (8th Cir. 2008) (citations omitted). "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the 'question is so free from doubt as to justify taking it from the jury.'" *Revels*, 382 F.3d at 876 (quoting *Naucke v. City of Park*

*Hills,* 284 F.3d 923, 928 (8th Cir. 2002) (quoting in turn *Ricketts v. Columbia,* 36 F.3d 775, 779 (8th Cir. 1994) (internal quotation marks omitted)).

Weber claims that Minten's speech was not the cause of his termination.  He argues that it was not the subject of Minten's speech that caused his termination but Minten's personal conversation while on duty, combined with five other incidents, that led him to fire Minten.  Thus, Weber contends that he has generated a genuine issue of material fact on whether Minten's speech was a motivating factor in the termination of his employment, precluding summary judgment for Minten on his First Amendment retaliation claim.  Minten counters that, while he may not have had a perfect employment record during his 21 years in the Osceola County Sheriff's Department, it is clear from the summary judgment record that his protected speech was a motivating factor in his termination.  I agree.

At the time he was fired on February 1, 2010, Weber labeled Minten's actions as "insubordination."   Weber memorialized his reason for firing Minten in a file memorandum, writing:  "Effective February 1, 2010 Deputy Dan Minten is terminated for insubordination.  Deputy Minten is not eligible for re-hire."  Weber memorandum at 1, Defendant's App. at 39.  Weber later told several deputy sheriffs that it was inappropriate for Minten to offer to testify while on duty. On February 8, 2010, as part of Minten's unemployment compensation process, Weber wrote he fired Minten for "misconduct" on "08-31-09."  Employer Statement of Protest Form at 12; Plaintiff's App. at 41.  Weber went on to remark on the form, "Insubordination on or about 08-31-09".  Employer Statement of Protest Form at 2; Plaintiff's App. at 41.  On the same form, Weber offered the following explanation for Minten's firing:

> He is on video tape in the patrol car and he has a traffic stop
> talking to the daughter of a person who is suing us in federal

> court. He said he wanted to be part of the law suit [sic] but he
> wanted to be subpeneo [sic] so it looks like he has to. He said
> I shouldn't be saying this but he never looks at the video any
> way. This undermines me my office and the county. The
> lawsuit is about I denied an individual to carry a concealed
> weapon. My opinion is he is trying to cause me some injury
> or pain my enemy is his friend in this case. I did say I am not
> going to contest his unemployment. I gave him the
> opportunity to resign and he said no it would mess up my
> unemployment so I fired him like he asked.

Fact Finding Worksheet For Misconduct at 1; Plaintiff's App. at 47. Weber never mentions anything on the form about any other incident or cause being a reason for Minten's firing. Indeed, Weber concedes that Minten's offer to testify was, "when combined with five other unresolved matters. . .the last straw." Defendant's Resistance Br. at 5. Thus, Minten was fired because of his offer to testify in the Dorr Lawsuit. This conclusion is further buttressed by Weber's actions after Minten's firing.

On February 18, 2010, during a telephonic hearing on Minten's unemployment compensation claim, Weber repeated that he had fired Minten for "insubordination" resulting from his offer to testify in the Dorr Lawsuit. Audio CD; Plaintiff's App. 122. Weber characterized Minten's offer to testify as entering into a conspiracy to undermine the Osceola Sheriff's Office and Osceola County. Audio CD; Plaintiff's App. 122. During this hearing, Weber, again, never mentions any other incident being a reason for Minten's firing. On March 9, 2010, at an Osceola County Board of Supervisors meeting, in discussing Minten's termination, Weber stated, "[t]he issue is what his behavior was on the Dorr Stop. It's on videotape. It speaks for itself." Audio CD; Plaintiff's App. 123. Weber also commented: "he's talking about, free speech is one thing that's fine, but he wanted to take an active role to undermine the office of sheriff and undermine his

employer and that speaks for itself." Audio CD; Plaintiff's App. 123. On this record, I have little difficulty finding that Minten's offer to testify in the Dorr Lawsuit was a motivating factor in his termination. Although causal connection is generally a jury question, on this record "the 'question is so free from doubt as to justify taking it from the jury'" because no reasonable juror could find that Minten's offer to testify in the Dorr Lawsuit was not a motivating factor in Weber's decision to fire him. *Revels*, 382 F.3d at 876. Thus, I find that Minten has established his *prima facie* case of retaliation in violation his First Amendment rights.

### 3.   *Alternative reasons for Minten's firing*

Weber may yet prevail by demonstrating that he would have fired Minten regardless of whether he offered to testify. *See Givhan v. Western Line Consolidated Sch. Dist.,* 439 U.S. 410, 416 (1979); *McCullough*, 559 F.3d at 865; *Altonen,* 487 F.3d at 559; *Cox,* 790 F.2d at 672-676. The evidence is undisputed that Minten was fired because of his offer to testify in the Dorr Lawsuit. Weber concedes that Minten's offer to testify was, "when combined with five other unresolved matters. . .the last straw." Defendant's Resistance Br. at 5. This illustrates that Minten's protected speech was the tipping point in Weber's decision to fire him. In other words, but for Minten's protected speech, he would not have been fired. Thus, a reasonable jury would have no choice but to find that Minten was fired because he engaged in protected speech and that, absent his offer to testify in the Dorr Lawsuit, he would not have been fired. Minten's Motion for Summary Judgment is, therefore, granted, and Weber's motion is denied. The only issue remaining is the issue of Minten's damages, an issue which the parties have not addressed in their moving papers. Therefore, this issue will proceed to trial.

### III.  CONCLUSION

For the reasons discussed above, I conclude as a matter of law that Minten's offer to testify was protected speech under the First Amendment. Ferreting out unconstitutional conduct - here Sheriff Weber's violation of Paul Dorr's First Amendment rights for engaging in the clearly established traditional First Amendment activity of publicly criticizing a county elected sheriff-- is the hallmark of our free society and the bedrock principle behind the First Amendment.  Sheriff Weber doesn't even attempt to claim that Minton's offer to testify created a potential for disruption of the workplace,  an undermining of loyalty, efficiency, or morale, or an adverse impact on public confidence in law -- the standard incantations of law enforcement officials sued for constitutional violations by employees or former employees. More importantly, there is not a shred of evidence in the record to support any such disruption in the Sheriff's office based on Minten's offer to testify.  This is now the second time Sheriff Weber's actions have been held by this court to be unconstitutional and in direct violation of his oath of office. Minten's Motion for Summary Judgment is granted, and Weber's Motion for Summary Judgment is **denied**.  Sheriff Weber, a serial, recidivist, First Amendment violator, must now face a jury trial on damages on February 6, 2012.

**IT IS SO ORDERED.**

**DATED** this 22nd day of December, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA